UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | | |
|---|---|---|
| KENNETH LOVEDAY, | ) | |
| | ) | |
| *Plaintiff*, | ) | No. 1:15-cv-196-CLC-SKL |
| | ) | |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| *Defendant*. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

Plaintiff Kenneth Loveday ("Plaintiff") brought this action pursuant to 42 U.S.C. §
405(g) seeking judicial review of the final decision of the Commissioner of Social Security
("Commissioner" or "Defendant") denying her disability insurance benefits ("DIB"). Each party
moved for a judgment [Docs. 13 & 16] with supporting briefs [Docs. 14 & 17]. This matter is
now ripe, and for the reasons stated below, I **RECOMMEND** that (1) Plaintiff's motion for
judgment on the pleadings [Doc. 13] be **DENIED**; (2) the Commissioner's motion for summary
judgment [Doc. 16] be **GRANTED**; and (3) the decision of the Commissioner be **AFFIRMED**.

## I.    ADMINISTRATIVE PROCEEDINGS

Plaintiff filed his applications for DIB on May 25, 2012, alleging disability beginning on
January 11, 2012 (Transcript [Doc. 9] ("Tr.") 75, 138-39, 140-41, 168). Plaintiff's claim was
denied initially and upon reconsideration, and he requested a hearing before an administrative
law judge ("ALJ") (Tr. 75, 76-77, 80-84, 85-86, 88). The ALJ held a hearing on March 11,
2014, during which Plaintiff was represented by an attorney (Tr. 39-74). The ALJ issued a
decision on March 21, 2014, in which the ALJ determined Plaintiff was not under a "disability"
as defined in the Social Security Act (Tr. 16-33). Plaintiff timely requested that the Appeals

Council review the ALJ's unfavorable decision (Tr. 1-9). On June 26, 2015, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (Tr. 1-9). Plaintiff timely filed the instant action [Doc. 1].

## II.     FACTUAL BACKGROUND

### A.     Education and Employment Background

Plaintiff was born in 1959 and was 52 years old at his alleged onset date of January 11, 2012 (Tr. 32, 43, 140, 165). Plaintiff has at least a high school education (Tr. 32, 43), is able to communicate in English (Tr. 32, 167), and his past work includes working as a candy maker (Tr. 31, 169).

### B.     Medical Records

In his Disability Report, Plaintiff alleges disability due to a stroke (Tr. 168). The administrative record contains medical records, which have been summarized by the parties and the ALJ. Plaintiff's arguments primarily focus on the ALJ's consideration of the medical records and findings and opinions provided by certain examining, non-examining, and treating physicians, including Dr. Subroto Kundu, Dr. Joseph Powers, Dr. Samuel Olsen, and Dr. John McElligott, concerning Plaintiff's allegations of disability due to his stroke. While only portions of the record pertinent to the parties' arguments will be summarized here or addressed within the respective sections of the analysis below, the Court has carefully reviewed all relevant evidence in the record.

#### 1.     Dr. Subroto Kundu

On January 11, 2012, Plaintiff was admitted to the hospital with complaints of sudden inability to stand and difficulty speaking and he admitted to double vision when specifically asked (Tr. 231). Dr. Kundu, a neurologist, conducted a neurological evaluation of Plaintiff on

January 11, 2012 and diagnosed him with a brainstem infarction (i.e., stroke) (Tr. 24, 232). His neurologic examination confirmed slurring of speech, and tests for coordination demonstrated mild clumsiness in both upper extremities but his sensory modalities were intact (Tr. 231-32).

As early as January 26, 2012, Dr. Kundu advised that Plaintiff had made "an excellent recovery" and that he had no residual clinical signs or findings other than dysarthria, noting that Plaintiff's physical examination was within normal limits (Tr. 24, 294-95, 354-55). Dr. Kundu noted that Plaintiff complained of being unsteady on his feet (Tr. 24, 295, 355). In March 2012, Dr. Kundu noted that Plaintiff reported that he no longer drove, had some difficulty expressing himself, had very little stamina, and could not do minor yard activity (Tr. 292, 352). Dr. Kundu remarked that while Plaintiff continued to "complain bitterly of his degree of disability," Plaintiff had had a good recovery from his stroke (Tr. 24, 293 353). In May 2012, Dr. Kundu noted a normal examination with an assessment of only dysarthria (Tr. 24, 290-91, 350-51). He also noted that Plaintiff had had a good recovery from his stroke, was on appropriate treatment for stroke prophylaxis, and that no additional treatment measures were required (Tr. 24, 291, 351).

Plaintiff reported continued improvement to Dr. Kundu in August 2012 and that he was able to write a check but lacked "fine motor skills" (Tr. 24, 348). Dr. Kundu remarked in his treatment notes that Plaintiff had had a "satisfactory recovery, little or no objective deficits, though [the] patient has a litany of complaints" (Tr. 24, 349). In November 2012, Dr. Kundu's examination of Plaintiff remained unchanged, and he advised Plaintiff to remain active (Tr. 24, 401). During Plaintiff's February 2013 visit, Dr. Kundu noted that Plaintiff and his family were upset because he had been denied disability, and Dr. Kundu advised that Plaintiff had few objective deficits and that his claims of difficulty with speaking and inability to drive were difficult to attribute to his stroke (Tr. 24, 398-99). He further stated that Plaintiff had "no major

3

pathologies demonstrable in the investigative workup in the context of his stroke" (Tr. 24-25, 398). Dr. Kundu determined that there were no further treatment issues, and he discharged Plaintiff from his care and returned him to the care of his primary care physician (Tr. 399). Dr. Kundu did not provide a treating source statement of Plaintiff's restrictions and limitations for performing work.

### 2.    Dr. Joseph Powers

Dr. Powers is a cardiologist who examined Plaintiff to determine if there was a cardiac condition that contributed to his stroke (Tr. 25). He treated Plaintiff primarily from January through June 2012 (Tr. 25). Reports from monitoring Plaintiff's heart between January 17, 2012 and January 30, 2012 revealed "normal event monitoring" (Tr. 310). In February 2012, Dr. Powers stated that there was "[n]o obvious cardiac etiology" with Plaintiff's January 11, 2012 incident and "[n]o cardiovascular complaints have been noted" (Tr. 304). He noted that Plaintiff still had neurological complaints which he described as limited fine motor skills and ambulation and difficulty with falling to one side and balance (Tr. 304). He recommended physical therapy for the complained-of neurological defects (Tr. 305). Plaintiff continued to have no cardiovascular complaints during his March 2012 visit, and his cardiac testing was "unremarkable" (Tr. 25, 302). Dr. Powers noted that Plaintiff "has done well" (Tr. 302). Dr. Powers further noted that Plaintiff continued to work at his coordination and was somewhat unsteady on his feet (Tr. 302). He recommended that Plaintiff follow up with Dr. Kundu for his neurological complaints (Tr. 25, 303).

During his June 2012 visit with Dr. Powers, Plaintiff complained of fatigue and lack of energy, muscle weakness in his lower extremities, the inability to stand or walk for long periods of time, and occasional muscle aches in his legs (Tr. 25, 300). Dr. Powers did not test his muscle

strength and only commented on the unremarkable cardiac findings (Tr. 25, 300). Dr. Powers commented that it was unclear whether his muscle weakness and aches were related to the statin medication that Plaintiff was taking rather than the stroke, so Dr. Powers discontinued the statin medication (Tr. 300-01).

In January 2013, Plaintiff did not complain of fatigue or muscle weakness but alleged difficulty standing for more than 15 minutes (Tr. 29, 395). Dr. Powers stated that "[f]rom a cardiovascular standpoint he has done well" and he had no cardiac complaints (Tr. 395). Dr. Powers remarked that Plaintiff had "ongoing difficulty with neurologic symptoms related to his stroke," his neurological deficits limited his walking and fine motor movement, and Plaintiff also reported some difficulty with memory (Tr. 395). Dr. Powers then assessed that "[h]is persistent neurologic symptoms clearly present[ed] marked difficulty with regard to consideration of employment" and noted that Plaintiff was "currently in the process of obtaining long-term disability" (Tr. 395). From Dr. Powers's treatment notes, it did not appear that he performed a neurological examination or objectively evaluated Plaintiff's neurological complaints (Tr. 25, 395-96). Dr. Powers again recommended that Plaintiff follow up with Dr. Kundu regarding his neurological complaints (Tr. 396).

In the physical medical opinion form completed in May 2013, Dr. Powers opined that Plaintiff could occasionally lift or carry up to 10 pounds; could sit 8 hours, but could stand or walk 0 hours, in an 8-hour workday; and could never perform fine manipulation, typing, writing, or grasp small objects (Tr. 405-06).[1] Dr. Powers further opined that Plaintiff would need to rest

---

[1] Sedentary work involves lifting no more than 10 pounds at a time, occasionally lifting or carrying articles like docket files, ledgers, and small tools, standing and/or walking for a total of no more than approximately 2 hours of an 8-hour workday, and sitting for approximately 6 hours of an 8-hour workday. *See* 20 C.F.R. §§ 404.1567(a); Social Security Ruling ("SSR") 83-10, 1983 WL 31251, at *5 (1983).

more than the one 30-minute and two 15-minute breaks normally allowed and that Plaintiff's condition reasonably would cause lapses in his concentration or memory on a regular basis (Tr. 406).

### 3.    Dr. Samuel J. Olsen, II

Dr. Olsen is an internal medicine doctor who treated Plaintiff intermittingly beginning in 2007 for complaints of dizziness and right ear tinnitus which Dr. Olsen assessed as "acute vertigo" and prescribed medication (Tr. 25, 279).  In a visit in January 2012 following Plaintiff's hospitalization from his stroke, Dr. Olsen noted that Plaintiff complained of symptoms of occasional ataxia, including speech difficulties and abnormal gait, which Plaintiff described as improving (Tr. 273).  Based on his neurologic examination, Dr. Olsen noticed that Plaintiff's coordination was poor but his gait was normal (Tr. 274).

In August 2012, Plaintiff sought treatment for abnormal liver enzymes and complained of muscle aches due to statins (Tr. 376).  Dr. Olsen reported to Plaintiff that his hepatitis panel was negative and his ultrasound was normal (Tr. 377).  He also noted that Plaintiff said he rarely drinks now (Tr. 377).  From his neurologic examination, Dr. Olsen noted that Plaintiff had normal coordination, normal sensation and no focal motor deficits, and "broad-based (ataxic)" gait (Tr. 377).  He instructed Plaintiff to discontinue statin use "due to myalgias and arthralgias" (Tr. 25, 377).  In November 2012, Dr. Olsen assessed claimant with ataxia and noted that Plaintiff had no focal motor deficits, and while Plaintiff was unable to walk heel to toe, his gait was normal (Tr. 375).

In December 2012, Dr. Olsen completed two forms on behalf of Plaintiff.  He described his physical findings during his November 2012 examination of Plaintiff as poor concentration, walking, and word finding (Tr. 29, 371).  Dr. Olsen opined that Plaintiff could never lift or carry,

6

could sit 6 or more hours and stand or walk less than 1 hour in an 8-hour workday, and would need to take hourly breaks of 5 to 10 minutes (Tr. 29, 370, 371-72).[2] Dr. Olsen further opined that Plaintiff could never bend, squat, crawl, climb, reach, lift, carry, push, pull, perform simple grasping, or use repetitive feet movements such as operate foot controls (Tr. 371-72). Dr. Olsen determined that Plaintiff should be restricted from unprotected heights, being around moving machinery, driving automotive equipment, and being exposed to dust, fumes, and gases (Tr. 372). He stated that Plaintiff had symptoms severe enough to interfere with attention and concentration constantly (Tr. 29, 370, 372). Dr. Olsen opined that Plaintiff should not work (Tr. 370, 372).

In March 2013, Dr. Olsen noted that Plaintiff reported feeling well except for minor complaints such as having trouble walking and talking and with his memory (Tr. 26, 412). During this March 2013 examination and again during a September 2013 examination, Dr. Olsen described Plaintiff's gait as broad based and high stepping as well as slow, deliberate, and unsteady and noted that Plaintiff's tandem walking was impaired and he was not able to walk forward or backward heel to toe (Tr. 26, 413, 427). He described Plaintiff's mental status as anxious, his speech as stammering and stuttering, his thought and perception as normal, and his cognitive function as being aware of current events but not recalling past history (Tr. 26, 413, 427). He noted that Plaintiff's difficulties from the stroke included memory, speech, balance, fatigue, weakness, and anxiety and that Plaintiff could not type on a keyboard, and had fine motor problems evidenced by difficulty eating and unsafe driving (reflex responses) (Tr. 26, 413, 427). Dr. Olsen opined that Plaintiff was not safe to return to work or to drive (Tr. 26, 413, 427). He commented in March 2013 that a second opinion from a neurologist in Athens agreed that

---

[2] This meets the definition of sedentary work. *See supra* note 1.

Plaintiff was not safe to work and that the Plaintiff was pursuing Social Security disability benefits (Tr. 26, 413).[3]  In January 2014, Dr. Olsen treated Plaintiff for complaints of intermittent vertigo (Tr. 27, 428-29).  He noted that Plaintiff's memory was intact but described him as having slow stammering speech, poor coordination, and a very deliberate and careful walk (Tr. 27, 429).

### 4.    Dr. John McElligott

After performing a one-time independent medical examination ("IME") in December 2013, Dr. McElligott, an internal medicine doctor, concluded that Plaintiff could perform sedentary work but was limited to simple and firm grasping with his right hand occasionally and never with his left hand (Tr. 30, 444, 446).  He also limited Plaintiff to exerting up to 10 pounds of force while pushing on a flat stable surface without obstacles or deviation in going from Point A to Point B due to his ataxic gait and propensity to list to the right; restricted him never to pull; limited him to sitting frequently; restricted him from being around moving machinery, unprotected heights and unsupervised areas; and precluded him from operating a motor vehicle (Tr. 445).  Dr. McElligott did not describe the specific testing he performed to assess Plaintiff's manual dexterity, but he described Plaintiff's fine motor skills as showing "poor coordination

---

[3] The ALJ noted that the "second opinion" from a neurologist is not in the record (Tr. 26). Plaintiff explains that the records from Athens Neurology Clinic for Dr. Bibileishvili were submitted by Plaintiff to the Appeals Council immediately after Plaintiff obtained the records [Doc. 14 at Page ID # 504 n.1 (*see, e.g.,* Tr. 451-54 (Feb. 22, 2013 treatment notes from Athens Neurology Clinic submitted by Plaintiff to the Appeals Council))].  Upon review, the February 2013 records do not contain opinions regarding Plaintiff's functional limitations or his ability to work but instead recited Plaintiff's alleged symptoms and noted that Plaintiff had fluent speech, had steady gait, was able to perform tandem walking but had hesitation "which resembled gait appraxia [sic]."  Plaintiff does not argue that these records are new evidence that the ALJ must review and a basis for remand.  Additionally, Dr. Olsen noted in March 2013 that Plaintiff's neurologist reportedly had completed in August 2012 a form stating that Plaintiff could not return to work but would not give him a release to work (Tr. 26, 413).  The ALJ reported that the alleged form is not in the record and Dr. Kundu's notes do not address specifically whether Plaintiff could return to work (Tr. 26).

and moderate difficulty with rapid hand motion in a repetitive fashion" (Tr. 30, 444). He described Plaintiff's most obvious abnormality was "his ability to get up and down rapidly without losing his balance" but his Romberg test was normal; his finger to nose testing was normal but "tediously slow"; his gait was "slightly ataxic" and Plaintiff had to touch the wall to gain his balance; Plaintiff had "4 out of 5" strength in his lower extremities but had no atrophy and 3+ out of 5 strength in his upper extremities; and Plaintiff had "early fatigue" when doing "deep squats" (Tr. 30, 444).[4] Dr. McElligott also described Plaintiff's speech as "mild to moderate enunciation dysarthria noted during conversation" (Tr. 444).

Dr. McElligott completed a physical ability assessment form of Plaintiff's functional impairments for Plaintiff's insurance carrier (Tr. 446-49). He opined that Plaintiff could lift, carry, and push up to 10 pounds occasionally (Tr. 448) and could sit frequently between 2.5 and 5.5 hours in an 8-hour workday and stand or walk occasionally between 0 and 2.5 hours in an 8-hour workday (Tr. 446).

### 5.    State Agency's Consulting Physicians and Psychologists

Dr. Marcia Turner, a state agency medical consultant, reviewed the record and completed a physical residual functional capacity assessment form in July 2012. She determined that Plaintiff could perform medium work with the postural limitation of occasionally climbing ramps or stairs and never climbing ladders, ropes, or scaffolds and avoiding concentrated exposure to

---

[4] Dr. McElligott advised that he had reviewed the records from Athens Regional Medical Center and Athens Neurology Clinic, but the ALJ commented that the administrative record did not contain these medical records (Tr. 30). Plaintiff believes that Dr. McElligott may have been referring to a May 8, 2012 ultrasound or laboratory test performed at the Athens Regional Medical Center which was part of the administrative record [Doc. 14 at Page ID # 504 n.1 (citing Tr. 280-81, 287)].

hazards such as machinery and heights (Tr. 31, 314-15, 317).[5]  She noted that Plaintiff had had a

"good recovery" from the stroke and that his speech was fluent (Tr. 318).    After reviewing

additional evidence submitted after the SSA's initial denial, Dr. Turner's opinion was affirmed

by the subsequent review and opinions in September 2012 and December 2012 of Dr. Saul

Juliao, Dr. Gerald Smith, and Dr. Lisa Mani (Tr. 31, 361, 368, 387).

Dr. Andrew Phay, Ph.D., a state agency reviewing psychologist, completed a mental

residual functional capacity assessment form in August 2012 and found that Plaintiff was able to

remember and perform simple one, two and three step instructions but not multistep detailed

instructions or tasks and could maintain concentration, persistence, and pace (Tr. 31, 345).  Dr.

Phay also determined that Plaintiff could sustain an ordinary work routine around others, make

appropriate judgment decisions, and respond appropriately to changes and hazards in the work

place (Tr. 31, 345).  Dr. Robert Paul, Ph.D., affirmed this assessment on reconsideration in

September 2012 (Tr. 31, 360).

Dr. Philip K. Axtell, Ph.D., a state agency consulting psychological examiner, diagnosed

Plaintiff in August 2012 with an adjustment disorder but he primarily described deficits in

Plaintiff's short term memory (Tr. 22, 325, 327).  Dr. Axtell found that on the Wechsler Memory

Scales, Plaintiff scored in the low average range on most testing except he scored in the

borderline range in visual memory (Tr. 27, 325-327).  He noted that Plaintiff performed well on

a variety of memory tasks and Plaintiff's speech was normal in rate, clarity, and volume (Tr. 27,

---

[5] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds, standing and/or walking for a total of approximately 6 hours in an 8-hour workday and sitting occurring intermittently, and use of the arms and hands to grasp, hold, and turn objects as opposed to the finer activities in much sedentary work which requires precision use of the fingers as well as use of the hands and arms. *See* 20 C.F.R. §§ 404.1567(c); SSR 83-10, 1983 WL 31251, at *6 (1983).  If claimant can do medium work, the SSA has determined that he can also do sedentary and light work.  40. C.F.R. § 404.1567(c).

325).    Dr. Axtell commented that Plaintiff was able to follow both written and verbal instructions, to perform basic math problems in his head, and showed a "good capacity" for abstract thinking and understanding (Tr. 27-28, 325).  Dr. Axtell opined that Plaintiff evidenced mild to moderate impairment in short term memory but no impairment in his ability to sustain concentration or in his long term or remote memory (Tr. 28, 327).

### C.    Hearing Testimony

At the March 11, 2014 hearing, Plaintiff and a vocational expert ("VE") testified (Tr. 39-74).  The Court has carefully reviewed the transcript of the testimony at the hearing; however, only the portions of the hearing testimony relevant to the parties' arguments will be addressed as appropriate within the respective sections of the analysis below.

## III.    ELIGIBILITY AND THE ALJ'S FINDINGS

### A.    Eligibility

"The Social Security Act defines a disability as the 'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'"  *Schmiedebusch v. Comm'r of Soc. Sec.*, 536 F. App'x 637, 646 (6th Cir. 2013) (quoting 42 U.S.C. § 423(d)(1)(A)); *see also Parks v. Soc. Sec. Admin.*, 413 F. App'x 856, 862 (6th Cir. 2011) (quoting 42 U.S.C. § 423(d)(1)(A)).  A claimant is disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Parks*, 413 F. App'x at 862 (quoting 42 U.S.C. § 423(d)(2)(A)).    The Social Security

Administration ("SSA") determines eligibility for disability benefits by following a five-step

process. 20 C.F.R. § 404.1520(a)(4)(i-v). The five-step process provides:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment—i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities—the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). The claimant bears the

burden to show the extent of his impairments, but at step five, the Commissioner bears the

burden to show that, notwithstanding those impairments, there are jobs the claimant is capable of

performing. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512-13 (6th Cir. 2010).

### B.    The ALJ's Findings

The ALJ found Plaintiff met the insured status requirements through December 31, 2016

(Tr. 21). At step one of the process, the ALJ found Plaintiff had not engaged in any substantial

gainful activity since January 11, 2012, the alleged onset date (Tr. 21).[6] At step two, the ALJ

found Plaintiff had the following severe impairments: status post cerebrovascular accident, an

adjustment disorder, and possible mild memory deficits (Tr. 21-22). At step three, the ALJ

found Plaintiff did not have any impairment or combination of impairments to meet or medically

---

[6] The ALJ noted that Plaintiff reported receiving private short-term and long-term disability benefits (Tr. 21).

equal any presumptively disabling impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App'x 1 (Tr. 22-23). The ALJ specifically considered Listings 12.02 and 12.04, and determined that Plaintiff's mental impairments did not meet or medically equal the criteria in those listings (Tr. 22-23).

The ALJ determined Plaintiff had the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. § 404.1567(c) and was mentally capable of performing at least a full range of unskilled work (Tr. 23-31). At step four, the ALJ found that Plaintiff was unable to perform any of his past relevant work (Tr. 31-32). At step five, the ALJ noted that Plaintiff was 52 years old on the alleged disability onset date, had at least a high school education, and was able to communicate in English (Tr. 32). The ALJ found that the transferability of job skills was "not material to the determination of disability because using the Medical-Vocational Rules as a framework support[ed] a finding that the claimant is 'not disabled,' whether or not the claimant has transferable job skills" (Tr. 32). After considering Plaintiff's age, education, work experience, and RFC, and after utilizing the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P, App'x 2 ("Grids") as a framework for her decision and considering the testimony of a VE, the ALJ found there were jobs that existed in significant numbers in the national economy that Plaintiff could perform (Tr. 32-33). These findings led to the ALJ's determination that Plaintiff was not under a disability as defined by the Act at any time from the alleged onset date, January 11, 2012, through March 21, 2014, the date of the ALJ's decision (Tr. 33).

## IV.    ANALYSIS

Plaintiff alleges that the ALJ erred (1) in discounting Dr. McElligott's IME and report primarily due to its "purchased" nature, and (2) by giving inappropriate deference to the state

agency's reviewing medical consultants over Plaintiff's examining and treating physicians. Each of Plaintiff's arguments, which overlap to some degree, will be addressed below.

### A.    Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence. 42 U.S.C. § 405(g); *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (internal citations omitted). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *McClanahan*, 474 F.3d at 833 (internal citations omitted). Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (internal citations omitted). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387. The substantial evidence standard allows considerable latitude to administrative decision makers because it presupposes "there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference." *McClanahan*, 474 F.3d at 833 (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)).

The court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may not, however, consider any evidence which was not before the ALJ for purposes of substantial evidence review. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Furthermore,

14

the court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, No. 2:08-CV-189, 2009 WL 2579620, at *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, No. 1:08-CV-651, 2009 WL 3153153, at *7 (W.D. Mich. Sept. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claims of error without further argument or authority may be considered waived).

### B. Support for the ALJ's RFC Determination

Generally, Plaintiff argues that the ALJ erred in making his RFC determination by failing to give appropriate weight to the medical evidence. Plaintiff claims that the ALJ improperly discounted the IME and resulting opinion of Dr. McElligott because it was "purchased" by Plaintiff's private disability insurance company [Docs. 14 at Page ID # 505-07]. Plaintiff also contends that the ALJ inappropriately relied on non-examining consultants' opinions by giving them greater weight over the opinions of Plaintiff's examining and treating physicians [*id.* at Page ID # 509]. Defendant counters that the ALJ properly evaluated Plaintiff's credibility and the medical opinion evidence to determine Plaintiff's RFC [Doc. 17 at Page ID # 522]. Defendant further contends that there is substantial evidence to support the ALJ's RFC determination [*id.*].

A claimant's RFC is the most the claimant can do despite his or her impairments. 20 C.F.R. §§ 404.1545(a)(1). In other words, the RFC describes "the claimant's residual abilities or what a claimant can do, not what maladies a claimant suffers from—though the maladies will certainly inform the ALJ's conclusion about the claimant's abilities." *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002). Moreover, "[a] claimant's severe impairment may or

15

may not affect his or her functional capacity to do work. One does not necessarily establish the other." *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007).

An ALJ is responsible for determining a claimant's RFC after reviewing all of the relevant evidence in the record. *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). The ALJ is "tasked with interpreting medical opinions in light of the totality of the evidence." *Griffith v. Comm'r of Soc. Sec.*, 582 F. App'x 555, 564 (6th Cir. 2014) (citing 20 C.F.R. § 416.927(b)); *see also* 20 C.F.R. § 404.1527(b). The ALJ must determine which medical findings and opinions to credit and which to reject. *See Justice v. Comm'r of Soc. Sec.*, 515 F. App'x 583, 588 (6th Cir. 2013) ("In a battle of the experts, the agency decides who wins. The fact that [claimant] now disagrees with the ALJ's decision does not mean that the decision is unsupported by substantial evidence."); *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007) (In determining a claimant's RFC, "the ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions of any of the claimant's physicians."). A court will not disturb an ALJ's RFC determination as long as the finding is supported by substantial evidence. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### 1. Credibility Determination[7]

The ALJ's credibility analysis is "inherently intertwined" with the RFC assessment. *See Poppa v. Astrue*, 569 F.3d 1167, 1171 (10th Cir. 2009) ("Since the purpose of the credibility evaluation is to help the ALJ assess a claimant's RFC, the ALJ's credibility and RFC determinations are inherently intertwined."). An ALJ must consider "the claimant's allegations of his symptoms . . . with due consideration to credibility, motivation, and medical evidence of impairment." *Atterberry v. Sec'y of Health & Human Servs.*, 871 F.2d 567, 571 (6th Cir. 1989). Credibility assessments are properly entrusted to the ALJ, not to the reviewing court, because the ALJ has the opportunity to observe the claimant's demeanor during the hearing. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones*, 336 F.3d at 476. Where an ALJ's credibility assessment is fully explained and not at odds with uncontradicted evidence in the record, it is entitled to great weight. *See King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir.

---

[7] The SSA published SSR 16-3p, *Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims*, effective March 16, 2016, which supersedes SSR 96-7p, *Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*. SSR 16-3p eliminates use of the term "credibility" from SSA policy, as the SSA's regulations do not use this term, and clarifies that subjective symptom evaluation is not an examination of a claimant's character. *See* SSR 16-3p, 2016 WL 1119029, at *1 (Mar. 16, 2016). SSR 16-3p took effect on March 16, 2016, approximately two years after the ALJ issued his decision on March 21, 2014, and therefore is not applicable to the ALJ's decision in this case. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 209 (1988) ("Retroactivity is not favored in the law. Thus congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result."); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541-42 (6th Cir. 2007) ("We are not aware of any constitutional or statutory requirement that the Administration apply its [newly effective] policy interpretation rulings to appeals then-pending in federal courts, absent, of course, ex post facto or due process concerns not present here."); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642 (6th Cir. 2006) ("The Act does not generally give the SSA the power to promulgate retroactive regulations." (citing 42 U.S.C. § 405(a))). The text of SSR 16-3p does not indicate the SSA's intent to apply it retroactively. Moreover, SSR 16-3p instructs ALJs in accordance with the applicable regulations to consider all of the evidence in the record in evaluating the intensity and persistence of symptoms after finding the claimant has a medically determinable impairment, which is exactly what the ALJ has done in this matter.

1984) (noting the rule that an ALJ's credibility assessment is entitled to "great weight," but "declin[ing] to give substantial deference to the ALJ's unexplained credibility finding" and holding it was error to reject uncontradicted medical evidence); *see also White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009) (concluding the ALJ was entitled to "rely on her own reasonable assessment of the record over the claimant's personal testimony"); *Barker v. Shalala*, 40 F.3d 789, 795 (6th Cir. 1994) (stating the ALJ's credibility assessment is entitled to substantial deference); *Ulman v. Comm'r of Soc. Admin.*, 693 F.3d 709, 714 (6th Cir. 2012) ("As long as the ALJ cite[s] substantial, legitimate evidence to support his factual conclusions, we are not to second-guess."). Such substantial deference has been held to mean that "an [ALJ's] credibility findings are virtually 'unchallengeable.'" *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (quoting *Payne v. Comm'r of Soc. Sec.*, 402 F. App'x 109, 112-13 (6th Cir. 2010)).

Here, the ALJ considered Plaintiff's symptoms and the extent to which they were supported by and consistent with the evidence in the record, including the objective medical evidence (Tr. 23-24). *See* 20 C.F.R. § 404.1529. After considering the evidence, the ALJ found that Plaintiff's allegations regarding the intensity, persistence, and limiting effects of his symptoms were not entirely credible (Tr. 28). The ALJ found that the credibility of Plaintiff's complaints was undermined by the lack of significant objective and laboratory medical findings to support Plaintiff's complaints, Plaintiff's reported activities of daily living, Plaintiff's demeanor during the hearing, the medical opinion evidence, and inconsistencies between Plaintiff's statements and the other credible evidence (Tr. 21-31).

The ALJ considered the relatively mild residual findings noted on examinations, the findings of Plaintiff's treating neurologist Dr. Kundu that Plaintiff had few residual deficits from

18

his stroke, and the fact that there were no findings to support many of Plaintiff's alleged symptoms (Tr. 28). Dr. Kundu noted in August 2012 that Plaintiff had had "a satisfactory recovery, [with] little or no objective deficits" (Tr. 24, 403). Dr. Powers, Plaintiff's treating cardiologist, noted in January 2013 that Plaintiff had no cardiac complaints or findings and was doing well (Tr. 25, 395). While Dr. Powers noted Plaintiff's complaints of neurological difficulties, including "marked difficulty with standing for more than 15 to 30 minutes," he remarked that Plaintiff had had regular follow up appointments with Dr. Kundu and that his neurologic symptoms had been "fairly stable" (Tr. 25, 395). In February 2013, Dr. Kundu found that Plaintiff had few objective deficits and that there were "no major pathologies demonstrable in the investigative workup in the context of his stroke" (Tr. 24-25, 398). An ALJ may properly discount Plaintiff's allegations of the severity of his pain based on Plaintiff's allegations being inconsistent with the objective medical evidence in the record. *See Temples v. Comm'r of Soc. Sec.*, 515 F. App'x 460, 462 (6th Cir. 2013).

While Plaintiff complained of speech difficulties, the ALJ noted that he did not demonstrate any difficulty with speaking at the hearing (Tr. 28). An ALJ may consider a plaintiff's demeanor at the hearing as one of the factors in making the determination whether a plaintiff's pain is disabling as alleged. *See Walters v. Comm'r of Soc. Sec.*, No. 1:14-cv-481, 2015 WL 1851451, at *3-4 (S.D. Ohio Apr. 22, 2015); *King*, 742 F.2d at 975 n.2 ("[A]n ALJ, in making a finding on the issue of pain, may not rely *solely* on the demeanor of the applicant as observed by the ALJ at the hearing."). The ALJ further determined that there was "no evidence to suggest intermittent stuttering or word finding difficulty, if it has persisted, would significantly affect his ability to perform unskilled work" or that it interfered with his ability to communicate effectively (Tr. 28).

The ALJ noted that Plaintiff's activities of daily living were inconsistent with his subjective complaints (Tr. 28). Plaintiff reported being anxious in crowds and having difficulty with mental processing of some information, balancing, walking, using his hands, and fine motor skills (Tr. 176, 179, 198, 200, 203, 206, 323-24). Plaintiff, however, reported engaging in activities such as grocery shopping, mowing the grass for short periods of time, gardening, watching television, playing on the computer, visiting with friends, attending doctor appointments, and eating in restaurants (Tr. 28, 178, 180, 193-94, 199-201, 324, 327, 348). The ALJ determined that these reported activities are inconsistent with Plaintiff's allegations of having difficulty walking and using his hands, being anxious in a crowd, and being disabled (Tr. 28). *See Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 532 (6th Cir. 2014) (finding the ALJ properly considered the plaintiff's ability to spend time with family and other veterans, drive or walk to the local coffee shop, and assist with chores around the house when determining the credibility of the plaintiff's subjective complaints); *Temples*, 515 F. App'x at 462 (finding an ALJ may properly consider daily activities as one factor in the evaluation of subjective complaints); *Allen v. Comm'r of Soc. Sec.*, No. 94-4188, 1996 WL 15651, at *3 (6th Cir. Jan. 16, 1996) (finding the ALJ properly considered activities of cleaning house, shopping, watching television, playing cards with friends and driving in making his credibility determination).

The ALJ also discussed and considered the inconsistencies in the evidence with Plaintiff's subjective complaints. Inconsistent statements or evidence can undermine a plaintiff's credibility. *Stroud v. Comm'r of Soc. Sec.*, 504 F. App'x 458, 460 (6th Cir. 2012) (citing *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476-77 (6th Cir. 2003) (holding that an ALJ's credibility determination was reasonably based on the claimant's inconsistent testimony)). Plaintiff reported that he was unable to lift over 20 pounds, could not stand for more than 30 minutes, and

could not walk for more than 800 feet, but Plaintiff also reported that he shopped for groceries with his wife twice a week and mowed the lawn and gardened for an hour daily (Tr. 27, 178-79, 181, 195, 198, 201). The ALJ determined that Plaintiff's physical examinations did not establish any significant findings except that Dr. Olsen described some trouble with tandem walking (Tr. 27). According to Dr. Olsen's treating notes, Dr. Olsen routinely described Plaintiff's gait as normal, and there was no evidence in his examinations of residual motor deficits (Tr. 27). Dr. Kundu also described Plaintiff's gait as normal and noted that Plaintiff did not have any significant residuals from his stroke except with his speech (Tr. 27, 398-403).

Plaintiff also complained about his memory, but Dr. Olsen noted that his memory was intact (Tr. 27, 429). Dr. Axtell, a consultative examiner, noted that Plaintiff performed well on a variety of memory tasks (Tr. 27, 325). While Plaintiff evidenced mild to moderate impairment in his short term memory, Dr. Axtell determined that he had no impairment in his ability to sustain concentration or in his long term or remote memory (Tr. 28, 325). He further noted that Plaintiff's speech was normal in rate and clarity (Tr. 27, 325). The ALJ accepted Dr. Axtell's assessments because he used objective testing to form his opinion (Tr. 28). The ALJ determined that there was no evidence to show that Plaintiff's mild to moderate short term memory impairment would "preclude him from performing mental tasks of maintaining attention, concentration, persistence and pace associated with work" (Tr. 28).

Accordingly, the ALJ has fully explained his credibility assessment, and I **FIND** that there is substantial evidence in the record to support the ALJ's decision to discount Plaintiff's subjective allegations of his disabling impairments.

## 2.        Weight of Medical Opinion Evidence and the Treating Physician Rule

After considering all of the medical evidence and opinions, the ALJ gave the opinions of Dr. Powers, Dr. Olsen, and Dr. McElligott little weight, finding the opinions were inconsistent with Plaintiff's treating neurologist's longitudinal treatment records and findings. Instead, the ALJ gave considerable weight to the opinions of the state agency reviewing physicians and reviewing psychologist. Plaintiff argues that the ALJ incorrectly gave little weight to the opinions of Dr. Olsen and Dr. Powers, Plaintiff's treating physicians, and Dr. McElligott, Plaintiff's examining physician, and inappropriately deferred to the state agency's medical consultants. Defendant contends that the ALJ properly weighed the medical findings and opinions in accordance with the SSA's regulations.

Defendant has not contested that Dr. Olsen and Dr. Powers should be considered as treating physicians. The law governing the weight to be given to a treating physician's opinion, often referred to as the treating physician rule, is well settled: A treating physician's opinion is entitled to complete deference if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2) (now (c)(2)) (alteration in original). To determine whether substantial evidence is inconsistent with the treating source's opinion, the ALJ must examine the record as a whole, "not just medical opinions." *Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 628-29 (6th Cir. 2016) (citing *Hickey-Haynes v. Barnhart*, 116 F. App'x 718, 723-24 (6th Cir. 2004). Even if the ALJ determines that the treating source's opinion is not entitled to controlling weight, the ALJ must give "good reasons" for the weight he accords the treating source opinion, applying factors such as "the length of the treatment relationship and the frequency of

examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 192-93 (6th Cir. 2009) (quoting *Wilson*, 378 F.3d at 544; 20 C.F.R. § 404.1527(d)(2) (now (c)(2)); SSR 96-2p, 1996 WL 374188, at *4 (July 2, 1996)). While the ALJ is required to consider all medical opinions in the record, the ALJ, however, is not required to give "good reasons" for the weight given to the opinions of non-treating examining sources or non-examining sources. *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) ("[T]he SSA requires ALJs to give reasons for only *treating sources*.").

Plaintiff argues that the opinions of Dr. Olsen and Dr. Powers were consistent with a majority of the medical evidence, including their own treatment notes and Dr. McElligott's independent evaluation, and they were not inconsistent with the findings of Dr. Kundu, who did not provide a medical opinion [Doc. 14 at Page ID # 511]. After reviewing all of the evidence, the ALJ explained his reasons for assigning little weight to the opinions of Dr. Olsen and Dr. Powers which included his determination that their opinions and examinations reflected primarily Plaintiff's self-reported subjective complaints (Tr. 29-30). The ALJ is not required to accept the testimony of a medical examiner based solely on the claimant's self-reports of symptoms, but instead is tasked with interpreting medical opinions in light of the totality of the evidence. *See* 20 C.F.R. § 404.1527(b); *see also Bell v. Barnhart*, 148 F. App'x 277, 285 (6th Cir. 2005) (declining to give weight to a doctor's opinion that was only support by the claimant's reported symptoms).

The ALJ found that Dr. Powers's and Dr. Olsen's assessments of Plaintiff's limitations were not supported by their own treatment notes and were inconsistent with Dr. Kundu's

findings, which the ALJ assigned more weight based on his specialty as a neurologist (Tr. 29). The ALJ explained that Dr. Kundu advised that Plaintiff had few objective findings (primarily a speech problem) resulting from the stroke (Tr. 30). Dr. Powers's focus during his treatment of Plaintiff for a few months following the stroke was whether Plaintiff had any cardiac abnormalities, and he did not evaluate Plaintiff for his neurological complaints (Tr. 30). Dr. Olsen provided primary care to Plaintiff (Tr. 30). While Dr. Olsen stated that he did not feel that it was safe for Plaintiff to work or drive, he did not describe his specific safety concerns (Tr. 29). The issue of whether a claimant is disabled under the Act is reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1); *see also Walker v. Sec'y of Health & Human Servs.*, 980 F.2d 1066, 1070 (6th Cir. 1992) ("[T]he ultimate decision of disability rests with the [ALJ]."). An opinion on a matter reserved to the Commissioner, such as Plaintiff's RFC or whether Plaintiff is disabled, is not entitled to "any particular weight," even where the opinion is from a treating physician. *Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 505 (6th Cir. 2013). Accordingly, I **FIND** the ALJ has properly applied the treating physician rule and has given good reasons for the little weight assigned to the opinions of Dr. Olsen and Dr. Powers.

Plaintiff further contends that the ALJ improperly discounted the opinion of Dr. McElligott, a non-treating consulting examiner, who conducted an IME on behalf of Plaintiff's private disability insurance carrier for purposes of determining whether to continue his private long term disability benefits, in large part due to the "purchased" nature of the report and opinion. Plaintiff also contends that the ALJ failed to "review Dr. McElligott's examination report and opinion pursuant to the regulatory factors," ignored that "Dr. McElligott's findings were consistent with the longitudinal treatment records of both Drs. Olsen and Powers," and

incorrectly determined that Dr. McElligott's opinion was inconsistent with the treatment notes of Dr. Kundu [Doc. 14 at Page Id # 507].

While the ALJ commented during the hearing on the purchased nature of Dr. McElligott's examination and opinion, he did not rely on that fact in his written decision to give little weight to Dr. McElligott's opinions and findings. *See Daniel v. Comm'r of Soc. Sec.*, 527 F. App'x 374, 375 (6th Cir. 2013) (finding that, while the ALJ had speculated that the treating physician was sympathetic to the claimant, there was other substantial evidence to support he ALJ's decision on the treating physicians' credibility.) The ALJ explained that he gave Dr. McElligott's opinion little weight because it was a one-time evaluation and was inconsistent with the longitudinal treatment records and findings of Dr. Kundu, Plaintiff's treating neurologist (Tr. 30).[8] Although the ALJ provided good reasons for the weight he assigned to Dr. McElligott's opinion, the ALJ, however, was not required to do so since Dr. McElligott was not a treating physician.

Plaintiff argues that Dr. McElligott's opinion is consistent with Dr. Kundu's treatment notes because Dr. Kundu did not state that Plaintiff had recovered all functions after the stroke or to what degree his functions had been restored, did not discount Plaintiff's subjective complaints, and did not state in his records an opinion of what restrictions or limitations Plaintiff maintained [Doc. 14 at Page ID # 507-08]. Contrarily, Dr. Kundu noted in August 2012 that Plaintiff had

_____

[8] The ALJ also commented that Dr. McElligott's assessment suggested a worsening of Plaintiff's neurological condition when the record as a whole suggested Plaintiff's condition had been stable during the intervening years (Tr. 30). Plaintiff argues that this statement is incorrect because Plaintiff contends Dr. McElligott's findings and opinions are consistent Dr. Olsen's and Dr. Powers's findings and treating source opinions [Doc. 14 at Page ID # 508]. However, as discussed previously herein, the ALJ has given good reasons for discounting Dr. Olsen's and Dr. Powers's opinions including that their assessments of limitations were not supported by their own treatment notes and were inconsistent with the findings of Plaintiff's treating neurologist's assessment of Plaintiff's impairments.

little or no objective deficits although he had a "litany of complaints" (Tr. 26, 403). Further, Dr. Kundu advised Plaintiff in February 2013 that he had few objective deficits and his claims of difficulty speaking or driving were difficult to attribute to the stroke as Plaintiff was alleging so it would be difficult for him to establish the objective criteria to support a long term disability claim (Tr. 26, 398-99). Dr. Kundu also noted that Plaintiff had no major pathologies demonstrable in the investigative work up in the context of his stroke, and he advised that Plaintiff required no further treatment and returned him to the care of his primary physician (Tr. 26-27, 398-99). In fact, upon reviewing Dr. Kundu's treatment notes, it is clear that Dr. Kundu found Plaintiff did not maintain any significant deficits from the stroke and the objective evidence did not support Plaintiff's complaints of disabling symptoms from the stroke (Tr. 26-27, 398-99, 400-01, 403). Thus, Dr. Kundu did not include in his treatment notes any restrictions and limitations. Accordingly, I **FIND** that, while not required to do so, the ALJ gave good reasons and also has explained his reasoning for the little weight that he assigned to Dr. McElligott's opinion as a non-treating, one-time examining physician. I further **FIND** that the ALJ did not err in accepting Plaintiff's treating neurologist's findings over the findings and opinions of a non-treating consulting physician.

Additionally, Plaintiff contends that Dr. McElligott's findings of obvious speech abnormality, lack of balance, and poor coordination were consistent with the treatment records of Dr. Olsen and Dr. Powers who also reported that Plaintiff had difficulty with coordination, impaired walking, and a speech impediment [Doc. 14 at page ID # 507]. Defendant counters that Dr. McElligott's findings differed from Dr. Olsen's and Dr. Powers's treating medical source statements [Doc. 17 at Page ID # 528]. Dr. Olsen opined that Plaintiff could not lift any weight and could sit for six or more hours in an eight-hour workday as opposed to Dr. McElligott's

opinion that Plaintiff could lift up to 10 pounds occasionally and could sit for no more than 2.5 to 5.5 hours in an eight-hour workday (Tr. 371, 446-48). Dr. Kundu, however, found that Plaintiff had few objective deficits and advised Plaintiff to become more active (Tr. 30, 398-99, 401, 403). The ALJ ultimately decided to give little weight to the findings and opinions of Dr. Olsen and Dr. Powers and give greater weight to the findings of Dr. Kundu, the treating neurologist, based on his specialty (Tr. 29-30). It is the function of the ALJ to resolve the conflicts between the medical opinions, and "the ALJ is authorized to weigh conflicting medical evidence, taking into account, among other factors, an expert's 'medical specialty and expertise.'" *Justice*, 515 F. App'x at 588 (citing 20 C.F.R. § 404.1527(e)(2)(ii)).

Plaintiff contends that the ALJ gave inappropriate deference to the state agency's reviewing consultants' opinions over the opinions of Dr. Olsen and Dr. Powers, two treating physicians, and Dr. McElligott, a consultative examiner. Plaintiff asserts that the ALJ could not properly rely on the state agency's reviewing consultants' opinions because they did not review Dr. McElligott's IME report and opinion and Dr. Olsen's and Dr. Powers's treating source opinions before forming their own opinions [Doc. 14 at Page ID # 503, 508, 511]. Plaintiff relies on *Godbey v. Colvin*, No. 1:13CV-00167-HBB, 2014 WL 4437647 (W.D. Ky. Sept. 9, 2014), in support of his position there is not substantial evidence in the record to support the ALJ's decision to afford the state agency's reviewing consultants' opinions considerable weight. In *Godbey*, the Appeals Council remanded the case to the ALJ, and the district court had to decide whether the ALJ followed the Appeals Council's remand order and whether any failure to do so would serve as an independent ground for reversal absent any other error. The remand order in part directed the ALJ to "[o]btain evidence from a medical expert," which the ALJ did not do. *Id.* at *6. The Commissioner argued that the ALJ complied with the directive by reviewing and

giving weight to the opinions of physicians who had reviewed Plaintiff's medical records as medical experts, but the court found no merit in the Commissioner's argument because the medical opinions predated the ALJ's first decision and the Appeals Council would have included directions for the ALJ to reevaluate those opinions if that had been the Appeals Council's intentions. *Id.* Rather, the Appeals Council clearly wanted the ALJ to obtain new medical expert opinions about the nature and severity of the claimant's impairments. *Id.* Additionally, a substantial amount of new medical evidence regarding the claimant's impairments was added to the record following the Appeal Council's remand to the ALJ. *Id.* at *8. The court determined that an ALJ's failure to follow specific directives in the Appeals Council's remand order was an error that required a remand. *Id.* at *8.

Additionally, the district court in *Godbey* commented that the only opinion evidence in the record was the opinion of the non-examining state agency's physician who did not have an opportunity to review the new medical evidence in formulating his opinion and thus his opinion was dated and could not provide substantial material evidence about the nature and severity of the claimant's impairment. *Id.* The ALJ's RFC determination imposed slightly more restrictive postural limitations than the opinions of the non-examining state agency's physician. *Id.* The court determined that the ALJ without having the benefit of a current medical opinion to support his determination may have impermissibly interpreted the raw medical data in functioning terms and made his own independent findings. *Id.*

While the Western District of Kentucky district court case is not binding on this Court, it also is not persuasive in that it concerns a remand order and involves a situation where the only opinion evidence regarding the claimant's RFC predated the ALJ's first opinion and the new

medical evidence in the record. Here, the ALJ had multiple medical expert opinions to review and consider about Plaintiff's RFC after the ALJ reviewed all of the evidence in the record.

Additionally, as Defendant correctly argues, the ALJ properly considered as discussed and explained in his opinion the entire record, including the state agency's reviewing consultants' opinions, the findings of Dr. Kundu, and the opinions and medical evidence submitted after the state agency's reviewing consultants rendered their opinions which consisted of Dr. Olsen's, Dr. Powers's, and Dr. McElligott's opinions (Tr. 23-31). *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409 (6th Cir. 2009) ("[W]e require some indication that the ALJ at least considered [the subsequent opinions and medical evidence] before giving greater weight to an opinion that is not based on a review of a complete case record." (internal citation and quotation marks omitted)).

The ALJ noted that the state agency's reviewing consultants, Dr. Turner, Dr. Juliao, Dr. Smith and Dr. Mani, determined that Plaintiff could perform medium work, and the ALJ found that their opinions were consistent with the findings of Dr. Kundu that Plaintiff had few residual objective findings from his stroke (Tr. 31, 313-21, 361, 368, 387). Thus, the ALJ gave considerable weight to these opinions after considering all of the evidence in the record (Tr. 31). Additionally, the ALJ noted that he gave considerable weight to the opinions of the state agency's psychological reviewing consultants, Dr. Phay and Dr. Paul, who found that Plaintiff could perform unskilled work because they were consistent with the record as a whole and with Dr. Axtell's, the consultative examining psychologist's, opinions and findings (Tr. 31, 325, 345, 360). The ALJ explained that he considered all of the medical evidence in the record, weighed the medical opinions, and determined the credibility of Plaintiff's allegations giving him the benefit of the doubt as to his allegations of being unsteady on his feet and having balance

problems and complaints of intermittent dizziness/vertigo. Accordingly, I **FIND** that the ALJ properly weighed the opinion testimony after considering the entire medical record in accordance with the SSA's rules and regulations and provided good reasons for the weight assigned to his treating physicians' opinions. I further **FIND** that there is substantial evidence to support the ALJ's decision to assign considerable weight to the opinions of the state agency's reviewing physicians and psychologist.

After reviewing all of the evidence in the record and weighing the opinion testimony in accordance with the SSA's rules and regulations, the ALJ found that Plaintiff had the RFC for "unskilled, medium exertional work, limited only by occasional climbing of ramps and stairs and no ladder, rope, or scaffold climbing, and avoidance of concentrated exposure to hazards (particularly unprotected heights)" (Tr. 31). Although medical sources opine on a claimant's RFC, ultimately it is the ALJ's responsibility to determine the RFC. *See Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009); *see also* 20 C.F.R. § 404.1527(d)(2) & § 404.1546(c).

The question is not whether there is evidence in the record to support a finding of disability, but rather whether the decision reached by the ALJ is supported by substantial evidence in the record. *See Smith*, 99 F.3d at 782 (stating that "even if the district court—had it been in the position of the ALJ—would have decided the matter differently than the ALJ did, and even if substantial evidence also would have supported a finding other than the one the ALJ made, the district court erred in reversing the ALJ" where substantial evidence supported the ALJ's decision). Accordingly, I **FIND** that there is substantial evidence in the record to support the ALJ's RFC determination.

## V. CONCLUSION

Having carefully reviewed the administrative record and the parties' arguments, I RECOMMEND[9] that:

1) Plaintiff's motion for judgment of the pleadings [Doc. 13] be **DENIED**;

2) The Commissioner's motion for summary judgment [Doc. 16] be **GRANTED**; and

3) The Commissioner's decision denying benefits be **AFFIRMED**.


s/ *Susan K. Lee*
_____
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[9] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).